UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HILDA CECILIA VILLEGAS ex rel. LISUAL ARMANDO GUZMAN ANDUJAR, <br><br>                Petitioner, <br><br>         -against- <br><br> LADEON FRANCIS, *in his official capacity as Acting Field Office Director of New York Immigration and Customs Enforcement*; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; and PAM BONDI, *in her official capacity as Attorney General*, <br><br>                Respondents. | Case No. 1:25-cv-09199 (JLR) <br><br> <u>**OPINION AND ORDER**</u> |

JENNIFER L. ROCHON, United States District Judge:

Petitioner Lisual Armando Guzman Andujar ("Guzman Andujar" or "Petitioner"),

through his next friend Hilda Cecilia Villegas, petitions for a writ of habeas corpus under

28 U.S.C. § 2241, challenging the lawfulness of his detention by U.S. Department of Homeland

Security ("DHS") agents and seeking, *inter alia*, his release from DHS custody. *See generally*

Dkt. 1 ("Petition" or "Pet."). Guzman Andujar alleges that on November 4, 2025, DHS agents

arrested him immediately after he left a scheduled immigration court appearance in Manhattan

"without warning, cause, or explanation," in violation of the Due Process Clause of the Fifth

Amendment. Pet. at 6-7. For the reasons stated below, his Petition is GRANTED.

## BACKGROUND

Guzman Andujar is a citizen of the Dominican Republic who came to the United States

on January 27, 2023. Dkt. 12-2 at 1. He was arrested shortly after entry and detained under

8 U.S.C. § 1226(a).  *Id.* at 5.[1]  He subsequently received a Notice to Appear and was released on his own recognizance, again pursuant to 8 U.S.C. § 1226(a).  *Id.* at 1-2, 4, 6.  During the nearly three years that followed, Guzman Andujar resided in the United States, applied for asylum, and attended all scheduled immigration hearings — including a hearing set for November 4, 2025.  Pet. at 2-3, 6; Dkt. 14 ("Dawson Decl.") ¶¶ 12, 14, 17.  At the conclusion of that hearing, DHS officers detained Guzman Andujar without any individualized assessment of his flight risk or dangerousness.  Pet. at 6; *see* Dkt. 12-1 at 7-8; *see also* 8 C.F.R. § 236.1(c)(8).  He was given no notice that he would be arrested.  Pet. at 6.

Guzman Andujar, through his next friend, filed his Petition on November 4, 2025, the same day he was taken into immigration custody at 26 Federal Plaza, New York, New York.  Pet. at 3; Dawson Decl. ¶ 18.  He seeks an order directing Respondents to release him on his own recognizance or under parole, a low bond, or reasonable conditions of supervision.  Pet. at 9.  On November 10, 2025, Respondents filed a "Return to Habeas Petition," Dkt. 12 ("Return"), which included accompanying exhibits, Dkts. 12-1 and 12-2, a Declaration of Assistant Field Office Director Kristopher Dawson, *see* Dawson Decl., and a memorandum of law in opposition to the Petition, Dkt. 13 ("Opp.").  On November 14, 2025, Guzman Andujar filed his reply.  Dkt. 17 ("Reply").  On November 17, 2025, the Court held a hearing on the habeas petition.  Guzman Andujar is currently detained in the Orange County Jail in Goshen, New York, where DHS transferred him on November 8, 2025.  Dawson Decl. ¶¶ 19-20.

---

[1] Respondents' submissions show that Guzman Andujar expressed fear of "persecution or torture if returned to his country of citizenship" during inspection.  Dkt. 12-2 at 9.  Guzman Andujar was thus statutorily entitled to a credible fear interview.  8 U.S.C. § 1225(b)(1)(A)(ii).  Based on the record before the Court, he did not receive one.  *See generally* Dkts. 12-2, 14.

**LEGAL STANDARD**

Guzman Andujar brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). "Federal courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the constitutionality of their detention." *Lopez v. Sessions*, No. 18-cv-04189 (RWS), 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516-17 (2003)).

**DISCUSSION**

The Petition raises three issues: (1) whether Guzman Andujar is detained pursuant to 8 U.S.C. § 1225(b)(2)(A) ("§ 1225" or "§ 1225(b)"), which requires *mandatory* detention of noncitizens "seeking admission" to the country, or pursuant to 8 U.S.C. § 1226(a) ("§ 1226" or "§ 1226(a)"), which provides for *discretionary* detention of noncitizens "pending a decision on whether [they are] to be removed from the United States"; (2) whether, if Guzman Andujar is detained under § 1226, his detention without an individualized assessment of his flight risk or dangerousness violates the Due Process Clause; and (3) if his detention violates the Due Process Clause, whether administrative exhaustion, in the form of a bond hearing before an immigration judge, is required before the Court may grant his requested relief of release from DHS custody. The Court addresses each issue in turn.

**I.    Guzman Andujar Is Detained Under § 1226(a)**

"[O]ur immigration laws have long made a distinction between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958).

Recognizing this dichotomy, "U.S. immigration law authorizes the [g]overnment to detain certain [noncitizens] *seeking admission into* the country under §§ 1225(b)(1) and (b)(2). It also authorizes the [g]overnment to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added). Both § 1225 and § 1226 are part of the Immigration and Nationality Act ("INA"). Detention is mandatory under the former section but discretionary under the latter. The two provisions "are mutually exclusive — a noncitizen cannot be subject to both mandatory detention under § 1225 and discretionary detention under § 1226." *Lopez Benitez v. Francis*, --- F. Supp. 3d ---, 2025 WL 2371588, at *4 (S.D.N.Y. Aug. 13, 2025). The statutory scheme and Respondents' own exhibits make clear that Guzman Andujar was detained under § 1226, making his detention discretionary.

### A.    Section 1225(b) Does Not Apply to Guzman Andujar's Detention

As always, statutory interpretation begins with the statutory text. "Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). Section 1225(b) provides that "in the case of [a noncitizen] who is an applicant for admission, if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] *shall* be detained." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Thus, for § 1225's mandatory detention requirement to apply, an "examining immigration officer" must determine that the individual is: (1) an "applicant for admission"; (2) "seeking admission"; and (3) "not clearly and beyond a doubt entitled to be admitted." *Id.*; *see also Lopez Benitez*, 2025 WL 2371588, at *5; *J.G.O. v. Francis*, No. 25-cv-07233 (AS), 2025 WL 3040142, at *2-3 (S.D.N.Y. Oct. 28, 2025). At the time of his 2025 arrest, Guzman Andujar did not meet all three criteria, so

he could not have been detained under § 1225. In reaching its conclusion, the Court need only address, and distinguish between, the first two criteria.

Guzman Andujar was, and remains, "an applicant for admission." "[A]pplicant for admission" is a term of art that covers both noncitizens who "arrive[] in the United States" and those already "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1); *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 91 n.5 (1991) (noting that terms of art "*depart* from ordinary meaning"). "Admitted" is in turn defined as having gained "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Here, Guzman Andujar was an "applicant for admission" under both definitions of the term. He was first an applicant for admission when he "arrive[d] in the United States" in 2023. 8 U.S.C. § 1225(a)(1). At that time, Guzman Andujar did not gain *lawful* entry (*i.e.*, "admission") into the country. Instead, immigration officials deemed him inadmissible, Dkt. 12-2 at 1, and placed him in removal proceedings, *id.* at 4. Shortly thereafter, officers released him on his own recognizance and granted him entry into the United States (albeit unlawful entry) pursuant to § 1226. *Id.* Thus, at the time of his 2025 re-arrest, Guzman Andujar was "present in the United States" and "ha[d] not been admitted," again making him an applicant for admission. 8 U.S.C. § 1225(a)(1).

However, although he remained an applicant for admission, Guzman Andujar was no longer "seeking admission" at the time of his 2025 re-arrest and detention. Unlike "applicant for admission," "seeking admission" has no statutory definition. Determining the plain meaning of the phrase is straightforward. *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) ("Where, as here, there is no statutory definition of a term, we consider 'the ordinary, common-

sense meaning of the words.'" (quoting *Dauray*, 215 F.3d at 260)); *id.* ("If the meaning is plain, the inquiry ends there."). First, to "seek" is "to ask for" or "to try to acquire or gain." *Seek*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/seek (last visited Nov. 17, 2025). The use of a present participle, "seeking," "necessarily implies some sort of present-tense action." *Lopez Benitez*, 2025 WL 2371588, at *6 (quoting *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. 2025)); *see also J.G.O.*, 2025 WL 3040142, at *3; *Tumba Huamani v. Francis*, No. 25-cv-08110 (LJL), 2025 WL 3079014, at *3 (S.D.N.Y. Nov. 4, 2025). Next, the applicant must be seeking "admission," which is statutorily defined as "lawful entry . . . into the United States." 8 U.S.C. § 1101(a)(13)(A). "Entry" is not defined in the INA, *see generally id.* § 1101, so it can be given its "ordinary, contemporary, common meaning," *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). That meaning is "[t]he action or an act of entering a place." *Entry*, *Oxford English Dictionary*, https://doi.org/10.1093/OED/8274517121 (last visited Nov. 17, 2025); *see also Entry*, *Black's Law Dictionary* (12th ed. 2024) ("Any entrance of [a noncitizen] into the United States, whether voluntary or involuntary."). Entry therefore implies a geographic limit of entering a place, here the United States's entrance (*i.e.*, the border). All combined, "seeking admission" means presently trying to enter the United States at or near the border. *See Tumba Huamani*, 2025 WL 3079014, at *4 (explaining that DHS regulations understand an "applicant seeking admission" to be "synonymous with" "an applicant for admission coming or attempting to come into the United States at a port-of-entry" (quoting 8 C.F.R. § 1001.1(q)); *J.G.O.*, 2025 WL 3040142, at *3 (noting that "seeking admission" would "require[] [a noncitizen] . . . to want to *go into* the country"); *Alvarez Ortiz v. Freden*, ---F. Supp. 3d ---, 2025 WL 3085032, at *7 (W.D.N.Y. Nov. 4, 2025) (finding that "seeking admission" "must refer to seeking physical entry

at the border, not the legal right to enter").  In sum, when DHS agents detained Guzman Andujar

in 2025 after his scheduled immigration hearing, he was no longer seeking to enter the country.

He was already in — and had been for years.  *See Lopez Benitez*, 2025 WL 2371588, at *7

(holding that because "§1225(b)(2)(A) applies only to those noncitizens who are actively

'seeking admission' to the United States, it cannot, according to its ordinary meaning, apply to

[Petitioner], because he has already been residing in the United States for several years").  If

anything, Guzman Andujar was seeking "to obtain a lawful means to *remain* here" through his

asylum application and withholding of removal proceedings.  *Id.* at *6 n.7.  Therefore, § 1225

does not apply.

Respondents' contrary reading of § 1225 is unavailing.  Respondents read the phrase

"seeking admission" entirely out of the statutory provision.  *See* Opp. at 8-10.  They contend that

*anyone* who is in the United States without having been legally admitted, regardless of how long

they have been in the country, falls under § 1225.  *Id.*  In support of this position, Respondents

cite a recent Board of Immigration Appeals ("BIA") decision in *Matter of Yajure Hurtado*, 29 I.

& N. Dec. 216 (BIA 2025).  Opp at 10.  There, the BIA held that noncitizens who enter the

United States without admission or inspection are applicants for admission subject to mandatory

detention under § 1225(b)(2)(A), even if they have long been residing in the United States.

*Hurtado*, 29 I. & N. Dec. at 220.  While BIA decisions may be binding on DHS officers, Opp. at

10 n.3 (citing 8 C.F.R. § 1003.1(g)), they do not bind this Court, *see Loper Bright Enters. v.

Raimondo*, 603 U.S. 369, 385-86, 400-01 (2024) (explaining that statutory interpretation rests

with courts' "independent judgment" because "agencies have no special competence in resolving

statutory ambiguities").  That is particularly true in cases like this where DHS has consistently

proceeded otherwise.  *See Hurtado*, 29 I. & N. Dec. at 225 n.6 ("We acknowledge that for years

Immigration Judges have conducted [§ 1226(a)] bond hearings for [noncitizens] who entered the United States without inspection."); *see also* Transcript of Oral Argument at 44:19-22, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954) ("[Solicitor General]: . . . DHS's long-standing interpretation has been that 1226(a) applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended.").  The "weight of . . . a judgment [to defer] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994).  To that end, this Court is not persuaded by a BIA decision that is contrary to the statutory scheme, Supreme Court jurisprudence, and decades of DHS practice.  Nor are other courts in this District.  *See, e.g.*, *Tumba Huamani*, 2025 WL 3079014, at *5, 9 (granting habeas petition based on conclusion that petitioner's detention was under §1226(a) rather than §1225(b)(2) because petitioner was in the United States at the time of his detention); *J.G.O*, 2025 WL 3040142 (same); *Gonzalez v. Joyce*, No. 25-cv-08250 (AT), 2025 WL 2961626 (S.D.N.Y. Oct. 19, 2025) (same); *Lopez Benitez*, 2025 WL 2371588 (same); *Chipantiza-Sisalema v. Francis*, No. 25-cv-05528 (AT), 2025 WL 1927931 (S.D.N.Y. July 13, 2025) (same); *Samb v. Joyce*, No. 25-cv-06373 (DEH), 2025 WL 2398831 (S.D.N.Y. Aug. 19, 2025) (same).[2]

Indeed, Respondents' interpretation of § 1225 and *Hurtado*'s corresponding holding violate the rule against surplusage twice-over.  *See United States, ex rel. Polansky v. Exec.*

---

[2] Not every court has rejected Respondents' reading of § 1225 and the BIA's analogous holding. Respondents identified three courts that have adopted their position.  Opp. at 9 n.2 (citing *Chavez v. Noem*, No. 25-cv-02325, 2025 WL. 2730228, at *5 (S.D. Cal. Sept. 24, 2025) and *Vargas Lopez v. Trump*, No. 25-cv-00526, 2025 WL 2780351, at *9 (D. Neb. Sept. 30, 2025)); *Mejia Olalde v. Noem*, No. 25-cv-00168, 2025 WL 3131942, at *1 (E.D. Mo. Nov. 10, 2025).  The Court does not find these limited out-of-Circuit holdings persuasive for the reasons outlined below.

*Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning." (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).  "If, as Respondents argue, § 1225[] were intended to apply to all 'applicant[s] for admission,' then there would be no need to include the phrase 'seeking admission' in the statute."  *Lopez Benitez*, 2025 WL 2371588, at *6.  That is, § 1225 would simply read: "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that [the] alien ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained."  "Seeking admission" would be mere surplusage of the "applicant" requirement, 8 U.S.C. § 1225(b)(2)(A), in contravention of the canons of interpretation, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))); *see also Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 21 (2d Cir. 2022) (describing the "meaningful-variation canon" as "the principle that 'where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea'" (alterations adopted) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022))).

Respondents' reading of § 1225 would likewise render superfluous the mandatory detention provisions found in § 1226(c)(1)(A), (D), and (E).  Section 1226(c)(1)(A) mandates detention for "any [noncitizen] who is inadmissible by reason of having committed an offense covered in section 1182(a)(2) of this title," such as offenses related to controlled substances.  8 U.S.C. § 1226(c)(1)(A); 8 U.S.C. § 1182(a)(2)(A)(i)(II).  "[T]his mandatory detention under § 1226(c) would be unnecessary if all persons who have not been admitted into the United States were already subject to § 1225(b)'s mandatory detention provisions."  *J.U. v. Maldonado*, No. 25-cv-04836 (OEM), 2025 WL 2772765, at *8 (E.D.N.Y. Sept. 29, 2025) (quoting *Hasan v.*

*Crawford*, --- F. Supp. 3d ---, 2025 WL 2682255, at *9 (E.D. Va. Sept. 19, 2025)).  The Laken

Riley Act, which amended § 1226 earlier this year, would likewise be rendered purposeless.  *See*

Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025) (codified as amended at 8 U.S.C. § 1226(c)(1)(E)).

The Act makes noncitizens subject to mandatory detention if (1) they are inadmissible under

certain provisions of 8 U.S.C. §§ 1182(a) and (2) are charged with, arrested for, convicted of, or

admit to having committed certain crimes.  8 U.S.C. § 1226(c)(1)(E).  Under this amendment,

Congress intended for mandatory detention to be triggered only when the inadmissibility *and* the

criminal conduct criterion are met.  But anyone who is "inadmissible under paragraph (6)(A),

(6)(C) or (7) of section 1182(a)" is, by definition, an "applicant for admission," which would

mean that they were already covered under Respondents' reading of § 1225 — without any

additional criminal conduct requirement.  *Id.*; *see* 8 U.S.C. § 1182(a).  In other words, the text

added by the relatively recent Laken Riley Act would be almost entirely redundant.[3]  *See Marx*

*v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he cannon against surplusage is strongest

when an interpretation would render superfluous another part of the same statutory scheme.");

*see also Bilski v. Kappos*, 561 U.S. 593, 608 (2010) ("[The canon against surplusage], of course,

applies to interpreting any two provisions in the U.S.[]Code, even when Congress enacted the

provisions at different times."); *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts

to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Accordingly, the Court concludes that Congress intended for § 1226(a)'s discretionary

framework to apply to noncitizens arrested on a warrant while residing in the United States,

---

[3] The Act could perhaps still apply to visa overstays, as those noncitizens would have been
lawfully admitted but remained present unlawfully.  However, in enacting the Laken Riley Act,
"there is no indication that Congress intended § 1226 to be [so] limited . . . ."  *Lopez Benitez*,
2025 WL 2371588, at *8.

except as provided in § 1226(c).  It follows, then, that DHS detained Guzman Andujar under § 1226(a).[4]

### B.    The Record Confirms that Guzman Andujar Falls Within § 1226(a)'s Domain

DHS's interactions with Guzman Andujar in 2023 confirm that he is detained under § 1226(a).  At the time of his re-arrest in 2025, Guzman Andujar was, "inside the United States," *Jennings*, 583 U.S. at 288, awaiting "a decision on whether [he] is to be removed from the United States," 8 U.S.C. § 1226(a), which placed him squarely within the ambit of § 1226.  *See* Reply at 1-3.  Respondents nonetheless argue that Guzman Andujar was detained under § 1225(b)'s mandatory detention all along — despite every DHS record to the contrary — because his release on his own recognizance in 2023 did not change his status.  Opp. at 9-10.  Legally, according to Respondents, Guzman Andujar was effectively at or near the border when he was arrested on November 4, 2025 because he was subject to the so-called "entry fiction."  *Id.* at 10-12.

Under the "entry fiction," "aliens who have been denied admission to the United States yet are present within its border are 'treated, for constitutional purposes, as if stopped at the border.'"  *Traore v. Ahrendt*, No. 18-cv-00794 (JMF), 2018 WL 2041710, at *1 n.2 (S.D.N.Y. Apr. 30, 2018) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).  "[T]he fiction stretches to noncitizens stopped at or near the border," *J.G.O.*, 2025 WL 3040142, at *4, as well as those in the United States who have been paroled under § 1225, *Traore*, 2018 WL 2041710, at *1 n.2;

---

[4] It bears brief mention that Guzman Andujar was arrested and charged with one count of misdemeanor assault and one count of harassment in 2024.  Dkt. 12-1 at 15.  Neither offense falls within § 1226(c)'s limited exceptions to discretionary detention.  *See* 8 U.S.C. § 1226(c).  And both charges were dismissed on April 17, 2025.  Dkt. 12-1 at 15.  Thus, DHS's Record of Deportable/Inadmissible Alien from the date of Guzman Andujar's re-arrest indicated "no known criminal history."  *Id.* at 5.

11

*see also* 8 U.S.C. § 1182(d)(5)(A) ("§ 1182(d)(5)(A)") (specifying that humanitarian parole of noncitizens covered by § 1225 "shall not be regarded as an admission of the alien").  Guzman Andujar falls into neither category.

First, Guzman Andujar was arrested and detained nowhere near the border in 2025.  He was in New York City, some 2,000-plus miles away from San Luis, Arizona, where he had first entered the United States in 2023.  Dawson Decl. ¶¶ 3, 11.  That is orders of magnitude farther than any expanded "threshold of initial entry" recognized by the Supreme Court.  *See, e.g.*, *DHS v. Thuraissigiam*, 591 U.S. 103, 114, 139 (2020) (holding that a noncitizen detained "within 25 yards of the border" is treated as if stopped at the border).

Second, Guzman Andujar was never paroled under § 1225.  Noncitizens detained following inspection under § 1225 can only be paroled into the United States "for urgent humanitarian reasons or significant public benefit."  *Jennings*, 583 U.S. at 300 (quoting § 1182(d)(5)(A)).  Guzman Andujar was instead released on his own recognizance under § 1226(a).  Indeed, the documents related to his January 2023 arrest are rife with references to § 1226.  For example, when DHS encountered Guzman Andujar, it issued him an administrative arrest warrant, finding he is "liable to be taken into custody as authorized by [§ 1226]."  Dkt. 12-2 at 5.  Next, DHS made an initial custody determination, releasing Guzman Andujar "[p]ursuant to the authority contained in [§ 1226]."  *Id.* at 6.  Lastly, Guzman Andujar's corresponding Order of Release on Recognizance noted that he was being released "[i]n accordance with [§ 1226]."  *Id.*  Regardless of what Guzman Andujar's designation *could have been* upon entry, Respondents consistently treated him as someone already in the country pursuant to their discretionary authority under § 1226.

DHS's actions leading up to Guzman Andujar's 2025 re-arrest further confirm that he was conditionally paroled in 2023 under § 1226 and therefore not subject to the entry fiction. Although release on one's own recognizance under § 1226 and parole under § 1182(d)(5)(A) are both styled as "parole," they serve fundamentally different purposes. Parole "into the United States" under § 1182(d)(5)(A) permits a non-citizen to enter the country, subject to the government reserving its right to continue to treat the noncitizen "as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (citation omitted). It requires a "case-by-case" determination of urgent humanitarian reasons or public benefit, 8 U.S.C. § 1182(d)(5)(A), and is granted only on a temporary basis, *see* 8 C.F.R. § 212.5(e)(1) (observing that parole shall automatically terminate upon the noncitizen's "departure from the United States" or "at the expiration of the time for which parole was authorized"). Absent a set termination date, parole pursuant to § 1182(d)(5)(A) must be terminated "upon written notice to the [noncitizen]," which will "restore[]" them to "the status that he or she had at the time of parole." *Id.* § 212.5(e)(2)(i).

Here, nothing in the record indicates Guzman Andujar was allowed to enter the country in 2023 based on a case-by-case determination of urgent humanitarian reasons or public benefit. *See generally* Dkt. 12-2. His release documents indicate no termination date for his parole, *id.* at 4, which accordingly would have entitled him to receive notice that his parole was being terminated — if it indeed was pursuant to § 1182(d)(5)(A). The record does not reflect that he received any such notice. *See generally* Dkt. 12-1. The most logical conclusion to draw from DHS's failure to adhere to the mandates of 8 C.F.R. § 212.5, is that Guzman Andujar was — as his Order of Release on Recognizance explicitly states, Dkt. 12-2 at 4 — released on his own recognizance as a form of "conditional parole" under § 1226. *See* 8 U.S.C. § 1226(a)(2)(B) (providing for "conditional parole"). Conditional parole under § 1226 "releases a non-citizen

*already in the country* from domestic detention." *J.G.O.*, 2025 WL 3040142, at *4 (emphasis added) (quoting *Martinez*, 792 F. Supp. 3d at 215). These facts, taken together, lead this Court to conclude that Guzman Andujar was not mandatorily detained as a noncitizen "seeking admission" under § 1225, and thereafter paroled, but rather as someone "already in the country," *Jennings*, 583 U.S. at 288-89, released on his own recognizance in 2023 pursuant to Respondents' discretionary authority under § 1226.

Having found that Guzman Andujar is subject to § 1226, the Court next addresses whether his due process rights have been violated when DHS arrested him in 2025.

## II.   Respondents Violated Petitioner's Due Process Rights

"Once [a noncitizen] enters the country, the legal circumstance changes, for the Due Process clause applies to all persons within the United States, including [noncitizens], whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 679. The Due Process Clause of the Fifth Amendment prevents the Government from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. V. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)). "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).

In the Second Circuit, courts have looked to the *Mathews v. Eldridge* three-factor balancing test when determining the adequacy of process in the context of civil immigration confinement. *Id.* at 851 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). The test requires the Court to consider: "(1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Chipantiza-Sisalema*, 2025 WL 1927931, at *2 (citing *Mathews*, 424 U.S. at 355). As detailed below, applying the *Mathews* balancing test here, the Court finds that Guzman Andujar's detention violates due process.

### A.    The Private Interest

First, Guzman Andujar invokes "the most significant liberty interest there is — the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). A person's liberty cannot be abridged without "adequate procedural protections." *Zadvydas*, 533 U.S. at 690. Here, Guzman Andujar asserts that he was wrongfully detained without an individualized determination of his flight risk or dangerousness. Pet. at 2; Reply at 1. In so doing, he "does not contend that greater 'judicial-type procedures must be imposed upon the administrative actions' of [DHS] than those already required by law; [rather, he] argues that the agency must comply with the procedures already in place, and its failure to do so amounts to a complete and arbitrary denial of due process." *Kelly v. Almodovar*, No. 25-cv-06448 (AT), 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025) (quoting *Velasco Lopez*, 978 F.3d at 851).

Before DHS may exercise its discretion to detain a person "§ 1226(a) and its implementing regulations require [DHS] officials to make an individualized custody

15

determination." *Velasaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2000), *appeal withdrawn sub nom. Velasaca v. Wolf*, No. 20-cv-02153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020). Moreover, the regulations implementing § 1226(a) mandate that DHS officers make an individualized determination as to the appropriateness of detention based on two factors: (1) whether the noncitizen is a "danger to property or persons" and (2) whether the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). If, after conducting such an assessment, DHS ultimately decides to detain the noncitizen, that noncitizen may appeal that decision before an immigration judge, who must consider the same factors. *See* 8 C.F.R. §§ 1003.19(d),(e) (providing for review of bond and custody determinations by an immigration judge); *Matter of Siniauskas*, 27 I. & N. Dec. 207, 207 (BIA 2018) ("[A noncitizen] in a custody determination under [§ 1226], must establish to the satisfaction of the Immigration Judge and the Board that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight.").

Here, there is no record evidence that any kind of individualized determination was made as to Guzman Andujar. "In fact, nothing in the record reflects . . . (1) who made the decision to detain him, (2) when that decision occurred, (3) on what basis the decision to detain him was made, (4) whether there was any material change in circumstances with respect to [Guzman Andujar] that triggered his detention, or (5) whether there was any sort of new policy in place that triggered his detention." *Lopez Benitez*, 2025 WL 2371588, at *11. Rather, the record shows that DHS officials quite literally skipped Guzman Andujar's individualized assessment. *See* Dkt. 12-1 at 7. Among Respondents' exhibits is Guzman Andujar's November 4, 2025 "INA § 236(a) Initial Custody Determination," which includes a description of the two-factor assessment outlined in 8 C.F.R. § 1236.1(c)(8), as well as a checklist to confirm that the officer

has made "individualized determinations" as to each factor. *Id.* None of the list items are checked off. Instead, the officers responsible for Guzman Andujar's re-arrest solely checked the box for "Individual is NOT subject to § 236(a)—(Skip to Bottom and Sign)." *Id.* "The utter lack of transparency here is problematic, to say the least, as it makes it impossible to determine why [Guzman Andujar] was detained in the first place." *Lopez Benitez*, 2025 WL 2371588, at *11. Guzman Andujar's liberty interest is clearly established.

### B.    The Risk of Erroneous Deprivation

Second, the Court finds that the risk of erroneous deprivation is particularly high here. *See Valdez v. Joyce*, No. 25-cv-04627 (GBD), 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025) (finding re-detention absent a change in circumstances, procedure, or evidentiary findings established a high risk of erroneous deprivation of liberty interests). When DHS first released Guzman Andujar under § 1226, Dkt. 12-2 at 4, 6, "it could not have done so validly unless it did not consider him to be a flight risk or danger to the community at that time." *Lopez Benitez*, 2025 WL 2371588, at *12. Yet, when DHS re-arrested and detained Guzman Andujar in 2025, its determination was based solely upon "the pendency of [his] ongoing removal proceedings[.]" Dkt. 12-1 at 1. DHS's "fail[ure] to articulate any change in circumstances between the time of [Guzman Andujar's] initial release in 2023 and his re-detention in 2025" demonstrates its procedures' deficiencies. *Lopez Benitez*, 2025 WL 2371588, at *12 (citation modified).

### C.    The Government's Interest

Lastly, "the Attorney General's discretion to detain individuals under 8 [] U.S.C. [§] 1226(a) is valid where it advances a legitimate government purpose," such as "ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community." *Valdez*, 2025 WL 1707737, at *4 (quoting *Velasco Lopez*, 978 F.3d at 854);

*Zadvydas*, 533 U.S. at 690.  Here, there is substantial record evidence that Guzman Andujar is *not* a flight risk or a danger to the community.  In the nearly three years that Guzman Andujar has resided in the United States, he has filed for asylum, appeared at his immigration court proceedings, has family ties in New York, and has no criminal history.  Pet. at 2; Dkt. 12-1 at 5. Indeed, Guzman Andujar's presence at the immigration proceeding which was promptly followed by his arrest demonstrates that he was not a flight risk.  Respondents have not pointed to any evidence that Guzman Andujar posed a risk of flight or danger to the community sufficient to justify his detention, nor was that even evaluated at the time of his detention.  *See* Dkt. 12-1 at 7.  Thus, Respondents have failed to show a significant interest in Guzman Andujar's continued detention.[5]

### III.    Petitioner Is Entitled to Immediate Relief

The final issue to consider is whether administrative exhaustion, in the form of a bond hearing before an immigration judge, is required before the Court may grant Guzman Andujar's requested relief of release from DHS custody.  Although courts generally require "administrative exhaustion before immigration detention may be challenged in federal court by a writ of habeas corpus," *Quintanilla v. Decker*, 21-cv-00417 (GBD), 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021) (quoting *Joseph v. Decker*, No. 18-cv-02640 (RA), 2018 WL 6075067, at *5 (S.D.N.Y.

---

[5] The weight of Guzman Andujar's interest in being free from imprisonment coupled with DHS's failure to exercise *any* discretion in detaining Guzman Andujar — in contravention of its obligations under § 1226 and its implementing regulations — is alone sufficient to establish a due process violation when he was detained.  8 C.F.R. § 1236.1(c)(8).  Indeed, at least one court in this District has found that the *Mathews* test need not be applied where, as here, the petitioner "argues [and the record supports] that [his] detention was illegal from the start because of the lack of any due process," rather than contesting the length of his detention.  *Tumba Huamani*, 2025 WL 3079014, at *8-9 (citing earlier decision in *Rojas Acevedo v. Almodovar*, No. 25-cv-07189 (LJL), 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025).  As set forth above, even applying the *Mathews* test, the outcome is the same.  Respondents denied Guzman Andujar his due process.

Nov. 21, 2018)), exhaustion is a prudential, not statutory, requirement, *id.* There are "a number of exceptions" to the application of discretionary exhaustion requirements, including when "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (Sotomayor, J.). Respondents argue that if § 1226 applies to Guzman Andujar's detention, which the Court finds it does, he is entitled to a bond hearing and cannot seek habeas relief until he exhausts his administrative remedies, including that bond hearing. Opp. at 17-20. The Court does not agree and finds that two of the exceptions to exhaustion apply here: Guzman Andujar is excused from administrative exhaustion because he has no genuine opportunity for adequate relief and has raised a substantial constitutional question.

First, a custody re-determination pursuant to 8 C.F.R. § 236.1(d) is an inadequate remedy because there is no initial DHS decision to review.[6] Guzman Andujar does not contend that DHS *abused its discretion* in detaining him. He argues that DHS exercised *no discretion at all*. Having informed Guzman Andujar that he was being released on his own recognizance in 2023, DHS then restrained his liberty without any due process. "[T]he [g]overnment's violation of [his] constitutional rights originated with [his] detention in the first instance." *Tumba Huamani*, 2025 WL 3079014, at *7. Section 1226's implementing regulations state that bond hearings "are

---

[6] For this reason, this case is distinguishable from *Fontanelli ex rel. Bernal Garcia v. Francis*, No. 25-cv-07715 (JLR), 2025 WL 2773234 (S.D.N.Y. Sept. 29, 2025), wherein this Court concluded that exhaustion was required because "the Government [] presented evidence that Bernal Garcia did receive an individualized determination, submitted a sworn affidavit to that effect, and submitted documentation indicating that [he] received notice of that determination." *Id.* at *6 (internal citations omitted).

provided for the purpose of custody *re*-determination — a hearing held by an immigration judge *after* [DHS] makes its initial decision to detain." *Kelly*, 2025 WL 2381591, at *3 (citing 8 C.F.R. § 236.1(d)) (former emphasis in original); *see* 8 C.F.R. § 236.1(d)(1) ("After an initial custody determination . . . the respondent may . . . request amelioration of the conditions under which he or she may be released."). "Such a hearing is no substitute for the requirement that DHS engage in a 'deliberative process prior to, or contemporaneous with,' the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3 (quoting *Sessions*, 2018 WL 2932726, at *15). Because Guzman Andujar's petition challenges his 2025 re-arrest that was effected with no individualized determination, "there is no . . . decision" for him to "appeal." *Lopez Benitez*, 2025 WL 2371588, at *13.

Second, there is no doubt that — like others placed in the same position by the government's untethered reading of § 1225 — Guzman Andujar's Petition raises a substantial constitutional question that cannot properly be adjudicated administratively. *See, e.g.*, *Kelly*, 2025 WL 2381591, at *3. Here, Guzman Andujar does not merely seek an opportunity to contest his detention. Instead, he argues that his detention under § 1226 absent an individualized assessment is a violation of his due process rights. Reply at 4-6. Neither an immigration judge nor the BIA has jurisdiction to adjudicate constitutional issues. *See Quintanilla*, 2021 WL 707062, at *2. They are therefore not "positioned properly to adjudicate [Guzman Andujar's] claim." *Lopez Benitez*, 2025 WL 2371588, at *14. The Court finds that "[i]n light of the deprivation of [Guzman Andujar's] liberty, formerly granted and approved by Respondents, the absence of any deliberative process . . . , and the statutory and constitutional rights implicated, a

writ of habeas corpus is the only vehicle for relief.  It is, in essence, the most appropriate remedy." *Sessions*, 2018 WL 2932726, at *15.[7]

## IV.    The Court Need Not Address Guzman Andujar's Remaining Arguments

Having determined that Guzman Andujar's procedural due process rights were violated, and that he is entitled to a writ of habeas corpus on that basis alone, the Court does not address his alternative arguments regarding the INA or the Administrative Procedure Act.[8]

## CONCLUSION

The petition for a writ of habeas corpus is GRANTED.  Respondents are ORDERED to release Guzman Andujar from custody immediately and certify compliance with the Court's order by filing an entry on the docket no later than November 19, 2025 at 5 p.m.

Dated:  November 18, 2025
      New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

---

[7] During the hearing, Respondents contended that *Romero Perez v. Francis*, No. 25-cv-08112 (JGK), 2025 WL 3110459 (S.D.N.Y. Nov. 6, 2025) supports a finding that a bond hearing, rather than release, is the appropriate remedy here.  The Court disagrees.  *Romero Perez* did not address the two grounds under which this Court finds release to be appropriate.  *Id.* at *3 (focusing on the futility exception to exhaustion).

[8] Additionally, the Court dismisses as moot Guzman Andujar's request for attorney's fees and costs under the Equal Access to Justice Act, Pet. at 8, because he has retained counsel that is representing him on a pro bono basis, Dkt. 10.  The Court thanks Guzman Andujar's counsel for volunteering his time and expertise.

21